UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| FANIMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:08-cv-1071-TWP-WGH |
| | ) | |
| DAN'S FAN CITY, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This patent dispute is before the Court on Defendant Dan's Fan City, Inc.'s ("Fan City" or "Defendant") Motion for Summary Judgment. The instant lawsuit stems from Plaintiff Fanimation, Inc.'s ("Fanimation" or "Plaintiff") allegations that Fan City is infringing two of its design patents: (1) U.S. Design Patent No. D475,450 (the "'450 patent"); and (2) U.S. Design Patent No. D517,683 (the "'683 patent") (collectively, "patents-in-suit"). Fan City has filed a Motion for Summary Judgment contending that its products do not infringe the patents-in-suit and, alternatively, the patents-in-suit are invalid. For the reasons set forth below, Fan City's Motion for Summary Judgment [Dkt. 30] is **GRANTED** in its entirety.

## I. BACKGROUND

Plaintiff Fanimation is a designer, manufacturer, and distributor of electric ceiling fans for residential and commercial uses. Fanimation acquired the '450 patent from NICOR Lighting & Fans of Albuquerque, New Mexico on November 1, 2003. The '450 patent claims the ornamental design for a ceiling fan. Despite holding the design patent, Fanimation has never offered a product embodying the design disclosed in the '450 patent. Since June 3, 2003,

Fanimation has also owned the '683 patent, which claims the ornamental design for a ceiling fan's blade.

Like Plaintiff, Defendant Fan City is in the business of making, using, and selling ceiling fans and ceiling fan blades. In June 2006, Fan City began selling the 42" Bombay fan (the "Bombay fan"). Fanimation alleges that the Bombay fan infringes the '450 patent. Fanimation further alleges that Fan City's woven fan blades infringe the '683 patent. Fan City now seeks summary judgment that its accused products do not infringe the patents-in-suit. Fan City has also raised invalidity arguments as to the patents-in-suit. Additional facts are added below as needed.

## II. LEGAL STANDARD

Summary judgment is appropriate when the pleadings, affidavits, and other summary judgment evidence show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56©; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 322-25. Once a movant makes a properly supported motion, the burden shifts to the nonmovant to show that summary judgment should not be granted; the nonmovant may not rest upon the allegations in the pleadings, but must support the response to the motion with summary judgment evidence showing the existence of a genuine fact issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).

In considering whether genuine issues of material fact exist, a court must determine

whether a reasonable jury could return a verdict for the nonmoving party in the face of all evidence presented. *Id*. at 249. All evidence and reasonable inferences must be viewed in the light most favorable to the nonmovant. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## III. DISCUSSION

A design patent requires a new, original, and ornamental design. 35 U.S.C. § 171. Significantly, "a design patent is defined by the content of its drawing; the proper construction of a design patent focuses on the overall visual impression of its ornamental, novel features." *Minka Lighting, Inc. v. Maxim Lighting Int'l, Inc.*, 2009 WL 691594, at *2 (N.D. Tex. Mar. 16, 2009) (citing *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997)). For this reason, a court need not issue a detailed verbal description of the claimed designs, unless it is necessary or helpful. *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679 (Fed. Cir. 2008).

**A.     Infringement Analysis**

Infringement of a design patent is the unauthorized manufacture, use, or sale of the article embodying the patented design or any colorable imitation thereof. 35 U.S.C. § 289. To infringe, the accused product need not be identical to the patented design. *Minka Lighting*, 2009 WL 691594 at *2 (citing *OddzOn Prods.*, 122 F.3d at 1405). Recently, the Federal Circuit clarified the test for determining whether a design patent has been infringed. In *Egyptian Goddess*, the Court established that the operative question "is whether an ordinary observer, *familiar with the prior art . . .* would be deceived into believing [that the accused design] is the same as the patented [design]." 543 F.3d at 681 (emphasis added); *see also Wing Shing Products (BVI) Co. Ltd. v. Sunbeam Products, Inc.*, 665 F. Supp. 2d 357, 361 (S.D.N.Y. 2009) ("the law now

endows its hypothetical ordinary observer with the knowledge and competence to distinguish between the patented object and its predecessors.").

In some cases, where the claimed design and the accused design are plainly dissimilar, a comparison to the prior art may not be necessary. In less obvious cases, however, prior art plays an integral role in an infringement analysis, accentuating the similarities and differences between the accused design and the patented design. If, for instance, the patented design is close to the prior art, small differences between the accused design and the claimed design may become more noticeable, given the hypothetical ordinary observer's familiarity with the prior art. *See Wing Shing*, 665 F. Supp. 2d at 361 ("if the patent and the prior art are particularly close, the scale of comparison between the accused and patented designs shrinks."). Similarly, a robust array of similar prior art may magnify ostensibly small differences between designs. *Egyptian Goddess*, 543 F.3d at 678 ("Where there are many examples of similar prior art designs . . . differences between the claimed and accused designs that might not be noticeable in the abstract can become significant to the hypothetical ordinary observer who is conversant with the prior art."). Simply stated, prior art can serve as a guiding reference point, informing the hypothetical ordinary observer's analysis. With these principles in mind, the Court turns to its infringement analysis of the accused designs and the patents-in-suit.

### *1. The '450 patent*

Fan City argues the it does not infringe the '450 patent by selling its 42" Bombay fan. Describing the elements of a design with words alone is an exercise in futility. Therefore, the Court will compare the relevant designs using illustrations.

Comparisons between the claimed design and the accused design are set out below. The patented design is on the left and the accused product is on the right.

**The '450 patent**  **The accused product**

**Comparison from below:**




**Comparison from the side:**




5

**Comparison of the blade:**

 

These comparisons establish both similarities and differences between the accused product and the '450 patent. Indeed, both designs include five fan blades, blades with a rounded base portion, sides that converge to a rounded point, and blades with palm leaf designs on one side, and a smooth side on the other. The designs are not mere duplicates, however. The differences

between the designs include:

(1) <u>The shape of the fan blades</u>: The fan blades are shaped differently. The '450 patent is a wide oval, whereas the accused product is narrower. In common parlance, the '450 patent is more heart-shaped. The accused product, by contrast, is more like a teardrop.

(2) <u>The overlap of the fan blades</u>: The fan blades of the '450 patent overlap, creating a seamless star shape. The fan blades of the accused product do not overlap; thus, the overall shape is less like a star.

(3) <u>The pattern on the fan blades</u>: The lines on the fan blade of the '450 patent radiate from a circular focal point. By contrast, the lines on the accused product radiate from a center line.

Predictably, the significance of these differences is hotly contested. Fan City deems the differences significant; Fanimation disagrees, deeming them trivial. It would be senseless for the Court to attempt to divine the significance of these differences without viewing the prior art. Moreover, the need to review prior art is especially acute where, as here, the prior art is fairly robust. Indeed, the marketplace for fans that resemble foliage is surprisingly crowded.

The relevant prior art consists of:

(1) <u>Fanimation's Islander product</u>: Fanimation has offered the Islander since 1978. It is pictured below (on the left) next to an illustration of the '450 patent (middle), and the accused product (right):



7

(2) <u>Fan City's Palm Bay fan</u>: Fan City has offered the Palm Bay fan since June 2000. It is pictured below (left), next to the '450 patent (middle), and the accused product (right).



(3) <u>Paul Lutz's leaf design fan</u>: By 2000, Paul Lutz created a fan blade design featuring a leaf on the front of the fan blade with a flat back of the blade. A depiction of the Mr. Lutz's leaf blade is pictured below (left), next to the '450 patent (middle), and the accused product (right).



Obviously, there are differences among the prior art, the accused design, and the '450 patent. Unlike the '450 patent and the accused product, the Islander does not contain a smooth side on the top. Unlike the '450 patent and the accused product, the Palm Bay fan has four blades and no smooth side. Finally, unlike the '450 patent and the accused product, Paul Lutz's leaf fan uses a

leaf design in lieu of a palm design. Nonetheless, in light of the relatively cluttered prior art, the Court deems the differences between the accused product and '450 patent even more pronounced.

Fanimation maintains that the accused design and the '450 patent are "virtually identical," despite their differences. In making this argument, Fanimation attempts to downplay the differences, arguing that the ordinary observer would not discern such subtleties. First, Fanimation concedes that the accused product's blade appears to be slightly narrower than the design of the '450 patent, but, in a somewhat conclusory fashion, argues that "such a difference would not be noticeable to the ordinary observer." Second, Fanimation argues that the differences evident from viewing the designs from below – namely, the shape of the blade and whether the blades overlap – should be discounted because this is not the typical vantage point of the ordinary observer, as it would require the observer "to stand directly below the fan, and bend his or her neck almost 90 degrees upward." Indeed, when viewing the fans at an angle, which is the most common manner of viewing fans, the ordinary observer will not see this difference in overlap: "In particular, when viewed at virtually any angle of inclination, both the Bombay Fan and the '450 Patented design would include at least some blades that appear to overlap, and some blades that do not." Third, in attempt to minimize the differences between the shape and pattern of the fan blades, Fanimation emphasizes that the '450 patent covers a *fan design*, not a *fan blade design*. Thus, the ordinary observer would compare the fans as a whole, and would not compare the blades of dismembered fans sitting next to each other. When this perspective is accounted for, Fanimation argues, the ordinary observer would not notice a difference.

9

While these arguments are well-taken, the Court is not persuaded. As a general matter, the hypothetical ordinary observer, while perhaps not persnickety, is more discerning than Fanimation portrays. This ordinary observer is conversant in the prior art and examines *all* features of the product. *Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1241 (Fed. Cir. 2009) ("Our precedent makes clear that *all* of the ornamental features illustrated in the figures must be considered in evaluating design patent infringement.") (emphasis added). Moreover, the operative time frame for evaluating infringement is the product's normal use lifetime – from at least point the point of sale to the product's destruction. *Id.* ("The sale of a [product] occurs after it has been manufactured and before it is ultimately destroyed. Thus, the point of sale for a [product] clearly occurs during its normal use lifetime."). Finally, the scope of a design patent is exceedingly limited. *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995) ("Design patents have almost no scope. The claim at bar, as in all design cases, is limited to what is shown in the application drawings.").

With these principles in mind and against the backdrop of the prior art, the Court once again turns to the differences between the accused product and the '450 patent. First, the different blade shapes are significant because they give off a very different visual impression. Thus, the hypothetical ordinary observer would not believe that the accused product is the same as the patented design. In fact, the prior art Islander appears to employ a blade shape far more similar to the '450 patent than the accused product. Moreover, Fanimation's argument that the individual blades need not be considered because the design patent is for a ceiling fan – not its blades – falls flat. A quick review of the '450 patent reveals that the blades are the crux of the patented design.

Second, Fanimation's argument about angles and most common vantage points is also unavailing, given that the hypothetical ordinary observer must consider all features of the patented design. Viewing the designs in their entirety, the ordinary observer would readily discern a difference in blade overlap between the accused product and the '450 patent. Moreover, Fanimation's argument is especially curious because it included the view from directly below in its '450 patent. *See Minka Lighting, Inc.*, 2009 WL 691594, at *2 ("a design patent is defined by the content of its drawing"). The inclusion of this view in the '450 patent reinforces that this is a significant difference. Finally, the Court's position is further fortified by reviewing the prior art Islander's overlapping fan blades.

Third, the Court is not convinced by Fanimation's argument that the hypothetical ordinary observer would not notice the difference in the pattern of the fan blades. Obviously, fans with unique blades are purchased by "ordinary observers" who have a desire for fans with unique blades. Thus, it is difficult to imagine that these individuals would not pay reasonably close attention to the patterns on those fan blades. After all, the blade presumably piqued their interest in the first place. The Court's position is reinforced by reviewing the prior art Islander, which appears to employ a blade pattern more similar to the '450 patent than the accused product. Accordingly, the Court finds that the differences in pattern on the fan blades is also significant.

For these reasons, the Court is persuaded that as a matter of law, the ordinary observer familiar with the prior art would *not be deceived* into believing that the accused product is the same as the patented design. Therefore, the Court **GRANTS** Fan City's Motion for Summary Judgment as to the non-infringement of the '450 patent.

11

### 2. The '683 Patent

Fan City next argues that its woven fan blades do not infringe Fanimation's '683 design patent, which claims the ornamental design for a ceiling fan's blade. Comparisons between the claimed design and the accused product are set out below. The patented design is on the left and the accused product is on the right.




The images reveal similarities between the accused product and the '683 patent. Specifically, both employ a hexagonal weaving pattern and incorporate a distinctive edge design, including multi-layered strips with a decorative zig-zag patterned binding. However, the images also expose differences between the blades. First, they have a different shape and curvature; the accused blade is noticeably wider and rounder, especially at the bottom of the product. Second,

unlike the '683 patent, the accused blade does not contain a vertical rod extending from the bottom of the blade to the top. Finally, the accused blade does not contain angled strips crossing the vertical rod, whereas the '683 patent contains five such strips.

Without further analysis, the Court can find that the hypothetical ordinary observer would *not be deceived* into believing that the accused product is the same as the patented design. This position is further reinforced by the fact that hexagonal-patterned weaving is an old technique. For instance, Fan City directs the Court to an example of a Chinese basket embodying this design in *Plaiting Step-By-Step*, first published in 1976. Another example is shown in a Malaysian hat in *The Nature of Basketry*, published in 1986. The hypothetical ordinary observer would be conversant in this prior art. Below is an example of hexagonal plaiting:



In light of the detailed examination standard set out in *Egyptian Goddess, Minka Lighting, Inc.*, *supra.,* for the Court to find the hexagonal plaiting of the dissimilar products to be sufficient evidence of infringement would effectively broaden the scop of Plaintiff's patent to cover all fan blades using the traditional prior art of hexagonal-pattern weaving.

For these reasons, the Court **GRANTS** Fan City's Motion for Summary Judgment as to the non-infringement of the '683 patent.

**B.    Invalidity Analysis**

Fan City's invalidity argument presents more difficult questions. However, in light of this ruling, the Court, in its discretion, need not address Fan City's invalidity argument because it is effectively moot. *See Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 355 F.3d 1361, 1370-71 (Fed. Cir. 2004).

## IV. CONCLUSION

For the reasons set forth above, Fan City's Motion for Summary Judgment [Dkt. 30] is **GRANTED** in its entirety. A separate judgment shall accompany this entry.

SO ORDERED:

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Copies to:

**Michael R. Brunelle**
BARNES & THORNBURG LLP
mbrunelle@btlaw.com,kwenger@btlaw.com,cstamas@btlaw.com

**Dwight D. Lueck**
BARNES & THORNBURG
dwight.lueck@btlaw.com,kwenger@btlaw.com,cstamas@btlaw.com

**Paul J. Maginot**
MAGINOT MOORE & BECK
pjmaginot@maginot.com

**Harold C. Moore**
MAGINOT MOORE & BECK
hcmoore@maginot.com

**James Douglas Wood**
MAGINOT MOORE & BECK
jdwood@maginot.com